IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**
    Plaintiff,

vs.

                                              Cr. No. 13-1139 JAP

**ALBERTO SANCHEZ, a.k.a,**
**"Alberto Sanchez-Legrot, Alberto**
**Sanchez Leglot, and Alberto Leglot,"**
    Defendant.

### MEMORANDUM OPINION AND ORDER

In DEFENDANT SANCHEZ'S AMENDED MOTION TO SUPPRESS (Doc. No. 29) (Motion), Mr. Sanchez asks the Court to suppress (1) incriminating statements made by Mr. Sanchez after his July 26, 2012 arrest and (2) a firearm that police found in a vehicle being driven by Mr. Sanchez at the time of his arrest. The Government opposes the Motion. *See* GOVERNMENT'S RESPONSE TO DEFENDANT SANCHEZ'S AMENDED MOTION TO SUPPRESS (DOC. 29) (Doc. No. 31) (Response). On February 19, 2014, the Court held a hearing on Mr. Sanchez's Motion. The Government was represented by Louis Valencia; Mr. Sanchez was represented by Cliff McIntyre. At the hearing, Bernalillo County Sheriff's Department Detective A. Medrano (Detective Medrano) testified on behalf of the Government. Mr. Sanchez testified on his own behalf. Because the Court finds Detective Medrano's testimony credible, the Court will deny Mr. Sanchez's Motion.

### BACKGROUND

**A. Investigation of Mr. Sanchez**

The following facts, related to the pre-arrest investigation of Mr. Sanchez, are based on

1

the uncontroverted testimony of Detective Medrano.[1] Sometime after June 19, 2012, Detective Medrano received information from a confidential informant (CI) that Mr. Sanchez was selling marijuana and prescription pills out of his residence, 917 Palomas S.E., Albuquerque, New Mexico. Detective Medrano confirmed that Mr. Sanchez lived at 917 Palomas S.E., Albuquerque, New Mexico and reviewed Mr. Sanchez's criminal history.

Detective Medrano arranged a "controlled buy," which was executed sometime between July 16, 2012 and July 19, 2012.[2] On the day of the controlled buy, Detective Medrano first met with the CI and searched the CI for money and contraband; Detective Medrano did not find either money or contraband on the CI's person. Detective Medrano then directed the CI to call Mr. Sanchez and arrange to buy drugs. Detective Medrano provided the CI with $20 to purchase marijuana from Mr. Sanchez. Detective Medrano and other officers kept constant surveillance on the CI as the CI traveled to 917 Palomas S.E., Albuquerque, New Mexico. Detective Medrano observed Mr. Sanchez meet with the CI in the front yard. The CI and Mr. Sanchez entered the residence and remained inside for approximately five minutes. Detective Medrano and other officers kept constant surveillance on the CI as the CI left 917 Palomas S.E., Albuquerque, New Mexico and met Detective Medrano at a prearranged location. The CI told Detective Medrano that Mr. Sanchez sold the CI marijuana, which the CI handed to Detective Medrano. Detective Medrano searched the CI and did not find any money.

---

[1] The Court made these factual findings after listening to the testimony, reviewing its own notes, and discussing critical portions of the transcript with the Court Reporter. Because the Court Reporter did not have time to prepare a final, polished transcript prior to the Court's ruling, the Court does not cite to the transcript or directly quote the witnesses.

[2] The Court uses the dates from the Search Warrant, attached as Exhibit 1 to this MEMORANDUM OPINION AND ORDER, and Detective Medrano's direct testimony. On cross-examination, Detective Medrano agreed that three weeks had passed between the controlled buy and the July 26, 2012 execution of the search warrant. This appears to have been a simple miscalculation. At any rate, even if the controlled buy occurred more than three weeks prior to the execution of the warrant, this would not change the Court's decision.

On July 19, 2012, Detective Medrano prepared an affidavit for a warrant to search 917 Palomas S.E., Albuquerque, New Mexico. The affidavit set forth an abbreviated version of the facts listed above. Search Warrant at 3-4.

**B. July 26, 2012 Execution of the Search Warrant**

Unless otherwise noted, the following facts are based on the testimony of Detective Medrano. On the morning of July 26, 2012, Detective Medrano went to 917 Palomas S.E., Albuquerque, New Mexico. Around 9:30 a.m., Detective Medrano observed Mr. Sanchez leave the residence in a red Honda Civic. After following Mr. Sanchez for eight to ten miles, Detective Medrano directed a marked police unit to stop Mr. Sanchez. The uniformed officer arrested Mr. Sanchez and placed him in the back of the patrol vehicle. Detective Medrano drove the red Honda Civic to a parking lot near Mr. Sanchez's house where he met with other detectives and with the uniformed officer who was driving the patrol vehicle with Mr. Sanchez. The other detectives and the marked unit containing Mr. Sanchez followed Detective Medrano to 917 Palomas S.E., Albuquerque, New Mexico.

At that point, the officers executed the search warrant.[3] During the execution of the search warrant, Detective Medrano read Mr. Sanchez his Miranda warnings. Mr. Sanchez said that he understood his rights and was willing to talk to the police as long as they would release his fourteen-year-old daughter, who was present at the house at the time of the search. Detective Medrano escorted Mr. Sanchez's daughter to her grandmother's house next door. Upon his return, Mr. Sanchez told Detective Medrano that (1) the police would find pills in the kitchen cabinets and (2) there was a gun inside the toolbox in the red Honda Civic. Mr. Sanchez admitted he was a convicted felon. He explained that he was selling pills and marijuana to get money to

---

[3] Mr. Sanchez testified that the police had already entered his house before he arrived in the marked unit. However, whether the police entered before or after Mr. Sanchez arrived is immaterial.

fix his truck and use it for landscaping. Police seized several pill bottles from the kitchen and a Black Hi-Point .380 ACP from the vehicle.

At the hearing, Mr. Sanchez denied being read his Miranda rights or agreeing to talk to the police. According to Mr. Sanchez, he did not make any incriminating statements to Detective Medrano. Mr. Sanchez admitted that the toolbox in the red Honda Civic belonged to him; however, he stated that the police searched the vehicle without his permission. While he did not personally observe the search, he heard an officer tell Detective Medrano that they found a gun on the floorboard of the Honda. Mr. Sanchez explained that the toolbox was sitting on the passenger seat not the floor. In addition, the red Honda Civic belonged to a friend, although Mr. Sanchez had driven it before on multiple occasions.

### C. Mr. Sanchez's Motion to Suppress

In his Motion, Mr. Sanchez asks the Court to suppress (1) the incriminating statements and (2) the firearm, which police found in the vehicle. Mr. Sanchez does not challenge the validity of the search warrant and does not seek to suppress the prescription bottles and pills found in the house. Nonetheless, in the Response, the Government argues that the police would have inevitably discovered the prescription bottles and pills. The Government reads Mr. Sanchez's Motion as making the argument that the prescription bottles and pills are the fruit of the poisonous tree. However, Mr. Sanchez clearly limits his Motion to his statements and to evidence found in the vehicle. *See* Motion at 4, 7 ("Any subsequent statements made by Mr. Sanchez and any tangible evidence, including the firearm and ammunition that were later discovered in Mr. Sanchez's car should be suppressed.") ("The law and facts of this case dictate that both the firearm and any subsequent incriminating statements be suppressed."). The Court construes Mr. Sanchez's motion as challenging the admission of his statements and the firearms,

4

but not the prescription bottles and pills.[4]

## DISCUSSION

### A. The Incriminating Statements

Mr. Sanchez argues that the incriminating statements must be suppressed as the fruits of an illegal arrest. Mr. Sanchez cites *Bailey v. United States*, 133 S. Ct. 1031 (2013) to support his argument. In *Bailey*, the Supreme Court set limits on a police officer's authority to detain a bystander incident to the execution of a search warrant; the "categorical authority to detain incident to the execution of a search warrant must be limited to the immediate vicinity of the premises to be searched." *Id.* at 1041. However, the Supreme Court clearly indicated that *Bailey* does not affect the general rule that the police need not obtain a warrant to effect a valid public arrest. *Id.* at 1042 ("If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity . . ., the lawfulness of detention is controlled by other standards, including, of course, . . . an arrest based on probable cause."). In general, a public arrest is valid as long as the police have probable cause to effect the arrest. *See United States v. Watson*, 423 U.S. 411, 417 (1976) ("The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest.").

Here, it is clear that the police had probable cause to arrest Mr. Sanchez. The same facts that support the search warrant, whose validity Mr. Sanchez does not question, support Detective Medrano's decision to arrest Mr. Sanchez. A CI told Detective Medrano that Mr. Sanchez was selling pills and marijuana. Detective Medrano corroborated this information by planning and

---

[4] The Court notes that a challenge to the introduction of the prescription bottles and pills would be unavailing. The police had a valid warrant, which Mr. Sanchez does not challenge, to search the house. Detective Medrano testified that the police would have searched the whole house if Mr. Sanchez had remained silent. Because the police would have inevitably discovered the prescription pills and bottles, there is no basis to challenge their admissibility. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) ("[I]llegally obtained evidence may be admitted if it ultimately or inevitably would have been discovered by lawful means.) (internal citation omitted).

executing a controlled buy, where he observed the CI meet with Mr. Sanchez at Mr. Sanchez's residence.

Because Mr. Sanchez's arrest was supported by probable cause, subsequent statements he made are admissible as long as he was properly Mirandized. Although Mr. Sanchez claims that Detective Medrano did not read him his Miranda rights, the Court finds Detective Medrano more credible than Mr. Sanchez. In cases like this one, where the outcome depends on the credibility of the witnesses, the Court bears a heavy responsibility: to decide whose testimony was more trustworthy. This is not always an easy decision to make. The Court acknowledges that Mr. Sanchez's testimony, like Detective Medrano's, did not contain significant internal inconsistencies.

The Court bases its credibility determination on its careful observation of Mr. Sanchez. While Mr. Sanchez consistently denied that he waived his Miranda rights and that he agreed to talk to Detective Medrano, Mr. Sanchez refrained from providing direct answers to some of the Government's questions on cross examination. Mr. Sanchez's manner was occasionally combative. For example, Mr. Valencia asked Mr. Sanchez to admit that, as a convicted felon, he knew he was not permitted to possess a firearm. Instead of directly responding, Mr. Sanchez repeatedly answered: that was why he did not have one. Likewise, Mr. Sanchez quibbled with Mr. Valencia about his desire to have the police let his daughter leave the house. On direct examination, Mr. Sanchez testified that he asked the police to release her but did not agree to talk in exchange. However, on cross examination, Mr. Sanchez told Mr. Valencia that he was not overly concerned about his daughter remaining in the house as long as he could be close to her and see where she was. The Court does not provide these examples to criticize Mr. Sanchez or to cavil about every statement Mr. Sanchez made on the stand. The Court understands that

testifying can be stressful. The Court simply provides these examples in an attempt to capture, in writing, its impression of Mr. Sanchez. After comparing the statements and demeanor of Mr. Sanchez and Detective Medrano, the Court finds that Detective Medrano is the more reliable witness. Because the Court finds that Mr. Sanchez waived his Miranda rights, the Court will not suppress Mr. Sanchez's incriminating statements.

### B. The Firearm

Mr. Sanchez argues that the police lacked probable cause to search his vehicle. The Government concedes that the search warrant did not authorize the police to search the vehicle and that the affidavit in support of the search warrant did not establish probable cause to search the vehicle. Rather, the Government contends that probable cause to search the vehicle arose when Mr. Sanchez told the police there was a gun in the toolbox in the vehicle. Naturally, Mr. Sanchez denies telling the police about the gun. As a result, the admissibility of the evidence depends on whether Mr. Sanchez or Detective Medrano is telling the truth. For all the reasons stated above, the Court finds Detective Medrano to be the more credible witness. Because Mr. Sanchez, a convicted felon, told Detective Medrano there was a firearm in the vehicle he had been driving, Detective Medrano had probable cause to search the vehicle without a warrant under the automobile exception. *United States v. Corral*, 970 F.2d 719, 726 (10th Cir. 1992) ("If . . . the police have probable cause to believe that contraband is located in a specific container located within the automobile, they are authorized . . . to search the container. . . without awaiting a search warrant."). The Court will not suppress the firearm.

IT IS THEREFORE ORDERED that DEFENDANT SANCHEZ'S AMENDED MOTION TO SUPPRESS (Doc. No. 29) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE